**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                        :
LUDE JASMIN,                            :
                                        :
                    Plaintiff,          :        Civil Action No. 16–1002 (FLW)
                                        :
        v.                              :
                                        :                **OPINION**
STATE OF NEW JERSEY ECONOMIC            :
DEVELOPMENT AUTHORITY,                  :
                                        :
                    Defendant.          :
_____:

<u>**WOLFSON, United States District Judge**</u>:

 Plaintiff Lude Jasmin ("Plaintiff") brings this suit against her former employer, the New Jersey Economic Development Authority ("NJEDA" and "Defendant"), asserting employment discrimination under the following statutes: (i) Title VII of the 1964 Civil Rights Act ("Title VII"), 42 U.S.C. § 2000(e)— 2(a)(1); (ii) the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 to -42; (iii) the New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. 10:6-2(c); (iv) 42 U.S.C. § 1983; and (v) the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 630(b). In the present matter, Defendant moves to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), arguing that Plaintiff's NJLAD and ADEA claims are barred by sovereign immunity and that Plaintiff has failed to plead _prima facie_ claims of discrimination under Title VII. Plaintiff opposes the motion.[1] For the reasons set forth below,

---

[1]     Plaintiff does not, however, oppose the motion to dismiss Counts III and IV, because NJEDA, as an arm of the state, is undisputedly not a person subject to suit under NJCRA or 42 U.S.C. § 1983. Plaintiff's Opposition Brief ("Pl. Opp. Br."), at ¶ 111; 42 U.S.C. § 1983 (providing a cause of action for injuries by "every person [acting under] color of any statute[.]"); N.J.S.A.

1

Defendant's motion is **GRANTED** in part and **DENIED** in part as follows: Counts II, III, IV, and V are dismissed with prejudice; Defendant's motion as to Count I, the Title VII claim, is denied.

# I.    BACKGROUND[2]

Plaintiff was hired as a full-time compliance officer in January 2014, shortly after having served as a contractor for NJEDA in 2013. See Compl., ¶¶ 4-6. Plaintiff held this position until her employment was terminated in November 2014. Id. at ¶¶ 6, 25. As a Haitian-American woman, Plaintiff alleges that she "was the only black person" in her unit within NJEDA. Id. at ¶ 25. Plaintiff's duties included processing grant applications to determine economic eligibility for Hurricane Sandy victim aid programs. Id. at ¶ 6.

During her employment, senior compliance officers ("SCO") were responsible for assigning work to Plaintiff and reviewing the completed work files. Id. at ¶¶ 9-10. Plaintiff alleges that her SCO supervisors systematically withheld work from her and deliberately neglected to review her work, giving the appearance that Plaintiff was delinquent with her assignments. Id. at ¶¶ 8-9. Although this particular issue was remedied by a new work-flow system, Plaintiff alleges that she continued to be treated unfairly at her employment. Id. at ¶¶ 9-10. For example, the office instituted a tandem system in which compliance officers would jointly submit their work product.

---

10:6-2 (providing a state cause of action for injuries by "a person [acting] under color of law[.] " Indeed, it is well-established that an arm of the state, such as NJEDA, is not a "person" for purposes of § 1983. See Will v. Mich. Dept. of State Police, 491 U.S. 58 (1989); Karns v. Shanahan, 879 F. 3d 504, 519 (3d Cir. 2018). Because the NJCRA is analogous to § 1983, NJEDA is also not a "person" under the Act. See Perez v. Zagami, 218 N.J. 202, 212 (2014) (stating that "[t]he legislative history is replete with references that the [NJ]CRA was intended to provide New Jersey citizens with a state analogue to Section 1983 actions."); Ramos v. Flowers, 429 N.J. Super. 13, 22-23 (App. Div. 2012) (applying § 1983 analysis to a cause of action brought under the NJCRA); see also Roberts v. N.J. Turnpike Auth., No. 5478-14, 2016 WL 6407276 at *1, *3 (N.J. App. Div. Oct. 31, 2016) (incorporating § 1983 analysis and concluding that the Authority nor its officials were persons subject to NJCRA).

[2]    The following facts are taken from the Complaint and assumed as true.

Id. at ¶¶ 10-12. Plaintiff was partnered with David Guarini. Id. at ¶¶ 11-12. A senior officer allegedly instructed her to submit her work through Mr. Guarini. In that regard, Plaintiff alleges that she did not receive credit for her work because of this system. Id. at ¶ 12. Plaintiff further avers that despite her seniority, Mr. Guarini was lauded for the work she produced, and he was ultimately promoted. Id.

Plaintiff was also responsible for updating the master file at NJEDA. Id. at ¶ 15. She alleges that on several occasions, someone entered the system and erased her work. Id. According to Plaintiff, the purpose of this conduct was to sabotage Plaintiff's productivity when management audited the system. Id. As a result, Plaintiff began cataloguing her work files using a screen "snipping tool" to produce a photo record of her progress. Id. Allegedly, this method apparently provided Plaintiff some evidence to prove that someone was in fact erasing her work, and eventually, the unknown perpetrator ceased the alleged erasures. Id.

Additionally, Plaintiff claims that the SCOs would refuse to make eye contact with her, slammed doors near her, and generally attempted to disrupt her work. Id. at ¶¶ 14, 17-18. Plaintiff further claims that managers refused to answer or ignored her work-related questions. Id. at ¶ 18. On one occasion, Plaintiff was asked to clean up following a party despite not having been invited to the event; according to Plaintiff, this task was outside of her normal responsibilities. See id. at ¶ 27. Plaintiff further alleges differential treatment in terms of her schedule. Id. at ¶ 26. Employees were expected to be at work from 8:30 a.m.–4:30 p.m., but they were permitted to leave early if they arrived prior to 8:30 a.m. Id. When Plaintiff arrived at 8:00 a.m., however, supervisors denied her requests to leave at 4:00 p.m.

Following attempts to remedy the overall situation, Plaintiff unsuccessfully sought a transfer to a different division. Id. at ¶¶ 19-20. On another occasion, Plaintiff contends that she

sought advice from a black woman working in Human Resources at NJEDA. <u>Id.</u> at ¶ 21. Plaintiff

alleges that this woman empathized with her and advised her to "simply let it go and take it easy."

<u>Id.</u> Plaintiff asserts that she concluded from this meeting that she should not file a grievance at the

time. <u>Id.</u>

Near the end of Plaintiff's tenure at NJEDA, Meredith Marshall, one of her direct

supervisors, left the office. <u>Id.</u> at ¶ 22. Plaintiff identified Ms. Marshall as a supervisor who had

been sympathetic to Plaintiff's workplace struggles. <u>Id.</u> A SCO who "had been unkind" to Plaintiff

was promoted to replace Ms. Marshall as Plaintiff's supervisor. <u>Id.</u> Shortly thereafter, Plaintiff

allegedly received a text message on her work cellphone, containing the following racial epithet:

"Now you're my [N*****]." <u>Id.</u> at ¶ 22. Plaintiff deduced that the sender was her new supervisor,

because of the timing and context in which she received it. <u>Id.</u> Plaintiff did not share the text with

HR at the time. <u>Id.</u> at ¶ 24. Plaintiff avers that the message caused her to suffer emotional distress.

<u>Id.</u> at ¶ 23. Following these incidents, Plaintiff's employment with NJEDA was terminated in

November 2014.[3] <u>Id.</u> at ¶ 25. Plaintiff claims that the termination was raced-based. Based on

these alleged incidents, Plaintiff instituted this suit against Defendant.

## II.    LEGAL STANDARD

### A.    Rule 12(b)(1) Standard

Federal Rule of Civil Procedure 12(b)(1) requires the dismissal of a case for "lack of

subject-matter jurisdiction." FED. R. CIV. P. 12(b)(1). An assertion of Eleventh Amendment

immunity is a challenge to a district court's subject matter jurisdiction. <u>See</u> <u>Pennhurst State School</u>

<u>& Hosp. v. Halderman</u>, 465 U.S. 89, 98–100 (1984). When jurisdiction is challenged on this basis,

---

[3]    Prior to filing this lawsuit, Plaintiff timely filed an EEOC charge and received a Right-to-Sue Letter from the Equal Employment Opportunity Commission. <u>See</u> Right-to-Sue Letter dated November 17, 2015.

the plaintiff bears the burden of persuading the court that jurisdiction exists. See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991); Rudolph v. Adamar of N.J., Inc., 153 F.Supp.2d 528, 533 (D.N.J. 2001); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).

In evaluating a Rule 12(b)(1) motion to dismiss, the court must determine whether the motion attacks the complaint as deficient on its face, or whether the motion attacks the existence of subject matter jurisdiction in fact, apart from any pleadings. Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). In a case such as this, where a defendant presents a factual attack, the court may consider evidence outside the pleadings. See Gotha v. United States, 115 F.3d 176, 178–79 (3d Cir. 1997); Mortensen, 549 F.2d at 891–92. When a defendant attacks subject matter jurisdiction "in fact," they dispute the existence of certain jurisdictional facts alleged by the plaintiff. See Carpet Group Intern. v. Oriental Rug Importers Ass'n, Inc., 227 F.3d 62, 69 (3d Cir. 2000). In such a situation, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." Mortensen, 549 F.2d at 891. Additionally, the burden of proving the existence of subject matter jurisdiction lies with the plaintiff. Id.

**B.      Rule 12(b)(6) Standard**

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a claim "for failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When reviewing a motion to dismiss, courts must first separate the factual and legal elements of the claims, and accept all of the well-pleaded facts as true. See Fowler v. UPMC Shadyside, 578 F.3d 203, 210–211 (3d Cir. 2009). All reasonable inferences must be made in the plaintiff's favor. See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010). In order to survive a motion to

dismiss, the plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). This standard requires the plaintiff to show "more than a sheer possibility that a defendant has acted unlawfully," but does not create as high of a standard as to be a "probability requirement." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

The Third Circuit has required a three-step analysis to meet the plausibility standard mandated by Twombly and Iqbal. First, the court should "outline the elements a plaintiff must plead to state a claim for relief." Bistrian v. Levi, 696 F.3d 352, 365 (3d Cir. 2012). Second, the court should "peel away" legal conclusions that are not entitled to the assumption of truth. Id.; see also Iqbal, 556 U.S. at 678–79 (stating that factual allegations must support legal conclusions). It is well-established that a proper complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (internal quotations and citations omitted). Finally, the court should assume the veracity of all well-pled factual allegations, and then "determine whether they plausibly give rise to an entitlement to relief." Bistrian, 696 F. 3d at 365 (quoting Iqbal, 556 U.S. at 679). A claim is facially plausible when there is sufficient factual content to draw a "reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. This step of the analysis is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679.

## III.    DISCUSSION

### A.    Sovereign Immunity

NJEDA claims that, pursuant to the Eleventh Amendment, it is immune from suit under the ADEA and the NJLAD. The Eleventh Amendment provides: "[t]he judicial power of the

United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." U.S. CONST. AMEND. XI. The Eleventh Amendment affords states and state agencies immunity from suits brought by citizens in federal court. See MCI Telecom. Corp. v. Bell Atl.-Pa., 271 F.3d 491, 503 (3d Cir. 2001); see also Edelman v. Jordan, 415 U.S. 651, 663 (1974). This immunity applies regardless of whether legal or equitable relief is sought. See Halderman, 465 U.S. at 100–01; see also Thorpe v. New Jersey, 246 Fed. Appx. 86, 87 (3d Cir. 2007) ("The Eleventh Amendment of the U.S. Constitution protects a state or state agency from a suit brought in federal court by one of its own citizens regardless of the relief sought . . . ").[4]

Arms of the state—including agencies, departments, and officials—are entitled to the protection of Eleventh Amendment immunity from suit when the state is the real party in interest. See Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess, 297 F.3d 310, 323 (3d Cir. 2002); see also Chisholm v. McManimon, 275 F.3d 315, 323 (3d Cir. 2001). Those entities, by their very nature, are so intertwined with the state that any suit against them renders the state the real, substantial party in interest. See Maliandi v. Montclair State Univ., 845 F.3d 77, 83 (3d Cir. 2016). Where there is no precedent that a particular agency, as a matter of law, is an arm of the state for sovereign immunity purposes, courts employ a fact-intensive, three-step balancing step to ascertain whether a state-affiliated entity is an arm of the state that falls within the ambit of the Eleventh Amendment. See id. The test was first developed in Urbano v. Board of Managers, 415 F.2d 247, 250–51 (3d Cir. 1969), where the court identified nine factors to consider. Those factors were consolidated

---

[4] Eleventh Amendment immunity is subject to an exception under the Ex Parte Young doctrine: suits against individual state officers for prospective injunctive and declaratory relief to end an ongoing violation of federal law. Plaintiff does not seek this type of relief in this case.

two decades later into a more workable three-factor test. See Fitchik v. New Jersey Transit Rail Operations, Inc., 873 F.2d 655, 659 (3d. Cir. 1989).

The Fitchik factors are (1) funding: whether the state treasury is legally responsible for an adverse judgment entered against the alleged arm of the state; (2) status under state law: whether the entity is treated as an arm of the state under state case law and statutes; and (3) autonomy: whether, based largely on the structure of its internal governance, the entity retains significant autonomy from state control. Id. Each factor involves a fact-intensive inquiry. See Maliandi, 845 F.3d at 84 (quoting Bowers v. Nat'l Collegiate Athletic Ass'n, 475 F.3d 524, 546 (3d Cir. 2007) (internal quotations omitted)). The court balances the factors to determine whether an entity amounts to an arm of the state. See Fitchik, 873 F.2d at 664; Maliandi, 845 F.3d at 84. All three Fitchik factors are weighed equally; however, the funding factor typically breaks the tie in a close case. See Maliandi, 845 F.3d at 84; Febres v. Camden Bd. of Educ., 445 F.3d 227, 229–30 (3d Cir. 2006); Benn v. First Judicial Dist. of Pa., 426 F.3d 233, 239–240 (3d Cir. 2005). The party asserting the immunity has the burden of production and persuasion. See Bowers, 475 F.3d at 546 & n.25; Christy v. Pa.Turnpike Comm'n, 54 F.3d 1140, 1144 (3d. Cir. 1995).

In determining the funding factor, the court determines "[w]hether the money that would pay the judgment would come from the state," which includes considering "whether payment will come from the state's treasury, whether the agency has the money to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency." Karns, 879 F. 3d at 515 (quoting Fitchik, 873 F.2d at 659). The Third Circuit has recently observed that the "crux of the state-treasury criterion" is not whether the state will be the principal source of any funding, but rather whether the state is "legally responsible for the payment of [a] judgment." Karns, 879 F. 3d at 515 (quoting Febres, 445 F.3d at 233). In that regard, the Third Circuit has advised that

the "practical effect" of a judgment is not equivalent to a "legal obligation" sufficient to satisfy the funding factor. See Karns, 879 F.3d at 516; Maliandi, 845 F.3d at 87 n.7. For example, in Karns, NJ Transit argued that it is entitled to sovereign immunity, in part, because the state would pay its judgment. The court, however, found that the state was under no legal obligation to pay NJ Transit's debts or to reimburse NJ Transit for any judgment that Transit incurs. See Karns, 879 F.3d at 516. The court reasoned that while New Jersey may voluntarily appropriate funds to assist NJ Transit to cover its operating deficit, the State was not legally obligated to do so.[5] See id. Thus, the court found that NJ Transit could not meet the first Fitchik factor.[6]

Here, Plaintiff argues that this factor weighs against immunity, because Defendant has not satisfied its burden of showing that the State would ultimately be liable for judgments against NJEDA. In that regard, Plaintiff further argues that because this factor weighs so strongly against immunity, NJEDA is not entitled to immunity solely based on this factor. In response, Defendant argues that because it receives some funding from the State Treasury, any judgment paid by NJEDA would indirectly affect the State. Put differently, Defendant maintains that because NJEDA receives funding from the treasury, if NJEDA were to pay a judgment, that money would be indirectly coming from the state. I disagree.

The only authorizing statute related to funding states that NJEDA receives money from the State Treasury's General Fund to pay "the debt service incurred for such State fiscal year" on its bonds, subject to "appropriations being made from time to time by the Legislature." N.J.S.A. 34:1B-7.49(a-b). In other words, under the statute, NJEDA receives funding from the State to pay

---

[5] Notably, NJ Transit further conceded that it was not entirely reliant on state funds but rather that it received a combination of federal, state, and local funds to balance its budget.
[6] Despite failing to meet the first Fitchik factor, the Third Circuit ultimately held that NJ Transit is an arm of the state since the remaining Fitchik factors weighed in favor of immunity.

certain debt incurred from the issuance of bonds. Indeed, this Court has not found any provision of the authorizing statute that affirmatively obligates the State to pay for NJEDA's judgment incurred in connection with a lawsuit. Tellingly, NJEDA has not cited to any provision in that regard. While there is no dispute that NJEDA receives some state funding for certain specific purposes outlined by the statute, Defendant has not carried its burden of demonstrating how the state would be obligated to pay for a judgment against the Authority. Instead, Defendant's only argument is that the indirect effects of a judgment satisfy the first <u>Fitchik</u> factor. Despite Defendant's position in that regard, the recent Third Circuit decision in <u>Karns</u>, clearly rejected a similar argument that the "practical effect" of a judgment is equivalent to a "legal obligation" sufficient to satisfy the funding factor. <u>See</u> <u>Karns</u>, 879 F.3d at 516. Without any legal obligation from the State to pay a judgment, the state-treasury factor weighs against immunity.

I note, however, that I do not agree with Plaintiff's contention that this factor alone predominates the sovereign immunity analysis. Rather, each of the <u>Fitchik</u> factors are "co-equal" and "on the same terms." <u>Karns</u>, 879 F.3d at 513. To that end, "each case must be considered on its own terms, with courts determining and then weighing the qualitative strength of each individual factor in the unique factual circumstances at issue." <u>Id.</u> at 513-14 (citation and quotations omitted). That said, I turn next to the second <u>Fitchik</u> factor.

NJEDA's status under state law requires consideration of: (1) explicit statutory indications about how an entity should be regarded; (2) case law from the state courts; and (3) whether the entity is subject to laws for which the state itself has waived its own immunity. <u>See</u> <u>Cooper</u>, 548 F.3d at 306–07; <u>Bowers</u>, 475 F.3d at 548. Plaintiff argues that NJEDA's ability to sue and be sued in its own name weighs against immunity. <u>See</u> <u>Bowers</u>, 575 F.3d at 548. While NJEDA has that

ability, Defendant argues that NJEDA's immunity from state taxes and the power of eminent domain weigh in favor of invoking sovereign immunity.

Although NJEDA can sue and be sued, as the Third Circuit has instructed, that fact is not dispositive.  See Karns, 879 F.3d at 517; see also Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 676 (1999) (observing that a state does not "consent to suit in federal court merely by stating its intention to 'sue and be sued'").  Rather, there is considerable indication that New Jersey law considers NJEDA an arm of the state.  The New Jersey Economic Development Act, N.J.S.A. 34:1B-1 *et seq.*, which established NJEDA, provides that:

> The NJEDA is hereby established in, but not of, the Department of Treasury a public body corporate and politic, with corporate succession, to be known as the "New Jersey Economic Development Authority." The authority is hereby constituted as an instrumentality of the State exercising public and essential governmental functions, and the exercise by the authority of the powers conferred by the provisions of 34:1B-1 *et seq.* or 34:1B-4.1 shall be deemed and held to be an essential governmental function of the State.

N.J.S.A. 34:1B-1a.

Indeed, the Act proclaims that NJEDA "shall constitute the performance of an essential governmental function and the authority shall not be required to pay any taxes . . . [and] shall at all times be free from taxation of every kind by the State . . . ."  N.J.S.A. 34:1B-15.  Thus, as an instrumentality of the State, NJEDA is exempt from state taxes.  As the Third Circuit has made clear, these factors favor immunity.  See Christy, 54 F.3d at 1148 (noting that exemption from state property taxation is an attribute associated with sovereignty); Skehan v. State Sys. of Higher Educ., 815 F.2d 244, 249 (3d Cir. 1987) (concluding that immunity from local taxation of real property favors immunity); see also Karns, 879 F.3d at 517 (finding important to the sovereign immunity analysis that NJ Transit is statutorily "constituted as an instrumentality of the State exercising public and essential governmental functions.").

NJEDA also has the power of eminent domain, see N.J.S.A. 34:1B-5(d), which likewise favors immunity. In fact, the power of eminent domain is a hallmark of state sovereignty. See Dep't Envtl. Prot. v. Gloucester Envtl. Mgmt. Services, Inc., 923 F.Supp. 651, 658 (D.N.J. 1995); Christy, 54 F.3d at 1148 (recognizing that the power of eminent domain is associated with sovereignty); Karns, 879 F.3d at 517 (same). Accordingly, having reviewed NJEDA's status under the law, I find that this factor weighs in favor of immunity.

The final Fitchik factor evaluates an entity's autonomy. See Bowers, 475 F.3d at 548–49. Because of the State's fairly substantial control over NJEDA, this factor also favors immunity. For one, NJEDA is subject to several operational constraints by the New Jersey Legislature and the Governor. In that regard, NJEDA must make an annual report of its activities for the preceding calendar year to the Governor and the Legislature. N.J.S.A. 34:1B-4(j). The Authority is also required to audit its books and accounts and file those audits with the Secretary of State and Director of the Division of Budget and Accounting in the Department of the Treasury. See id. Moreover, the State Legislature has the authority to dissolve NJEDA and upon doing so, all property, funds and assets thereof shall be vested in the State. N.J.S.A. 34:1B-4(h). Perhaps, most importantly, NJEDA's activities are constrained by the executive branch of the State government since the Governor has the power to veto any actions taken by the Authority. N.J.S.A. 34:1B-4(i). See Fitchik, 873 F.2d at 664 ("[T]he degree of control by the governor is fairly substantial.").

Next, the Governor appoints the majority of NJEDA's membership. N.J.S.A. 34:1B-4(b) provides that "[t]he authority shall consist of the Commissioner of Banking and Insurance, the Commissioner of Labor and Workforce Development, the Commissioner of Environmental Protection, an officer or employee of the Executive Branch of State government appointed by the Governor, and the State Treasurer, who shall be members *ex officio*, and eight public members

appointed by the Governor as follows: two public members (who shall not be legislators) shall be appointed by the Governor upon recommendation of the Senate President; two public members (who shall not be legislators) shall be appointed by the Governor upon recommendation of the Speaker of the General Assembly; and four public members shall be appointed by the Governor, all for terms of three years." N.J.S.A. ,34:1B-4(b). The Governor's appointments demonstrate that NJEDA lacks autonomy, which favors a finding of immunity. See Karns, 879 F.3d at 518; Bowers, 475 F.3d at 548-49 (holding that a governor's appointment of a state university's entire governing board demonstrated a lack of autonomy favoring immunity); Irizarry-Mora v. Univ. of P.R., 647 F.3d 9, 15 (1st Cir. 2011) ("In further support of the proposition that the University is an arm of the Commonwealth, we note that ten of the thirteen members of its governing board are appointed by the governor."); Md. Stadium Auth. v. Ellerbe Becket Inc., 407 F.3d 255, 257 (4th Cir. 2005). Accordingly, all these facts suggest that NJEDA is an instrumentality of the State. Karns, 879 F.3d at 518.

In sum, while the state-treasury factor counsels against immunity, the state law and autonomy factors both tilt in favor of immunity. Weighing and balancing the qualitative strength of each factor in the context of this case, I find that NJEDA is regarded by the State as an arm of the state, entitled to invoke sovereign immunity. See, e.g., Karns, 879 F.3d at 519.

### i.     ADEA

As an arm of the state, NJEDA is immune from suits under the ADEA; the ADEA does "not abrogate the state's Eleventh Amendment immunity to suits by private individuals for damages." Shahin v. Delaware, 531 Fed. Appx. 197, 199 (3d Cir. 2013); see also Kimel v. Fl. Bd. of Regents, 528 U.S. 62, 91 (2000). In Kimel, the Supreme Court found that the Eleventh Amendment bars ADEA claims against states and arms of the state in either federal or state court.

528 U.S. at 91. Further, the Court reasoned that Congress exceeded its Fourteenth Amendment authority in drafting the ADEA to abrogate states' Eleventh Amendment immunity from suits by private individuals. See id. Accordingly, NJEDA is immune from suits under the ADEA and Count V is dismissed.

### ii.    NJLAD

Defendant asserts that NJEDA is immune from Plaintiff's suit for damages based on alleged violations of state law, specifically the NJLAD, under the Eleventh Amendment. In response to Defendant's argument regarding the NJLAD claim, Plaintiff again raises her argument that NJEDA is not an arm of the state, and thus, not entitled to invoke sovereign immunity. While there are certain exceptions that limit the breadth of the Eleventh Amendment, Plaintiff does not argue that any of those exceptions are applicable here.[7] Thus, based on the Court's conclusion that NJEDA is an arm of the state, I find that NJEDA may invoke sovereign immunity as to NJLAD claims in federal court. See Garcia, 210 F. Supp. 2d at 550; Bennett, 288 F. Supp. 2d at 683.

This Court is not alone in concluding that the State of New Jersey may not be sued under the NJLAD in federal court. In fact, "several courts within this district have previously held that the State of New Jersey may not be sued in federal court under the NJLAD." Hughes v. State of N.J. Office of Public Defender, No. 11–01442, 2012 WL 761997 at *3 (D.N.J. Mar. 7, 2012); see, e.g., Garcia, 210 F.Supp. 2d at 550; Bennett, 288 F.Supp.2d at 683. Although NJLAD clearly

---

[7]    The Third Circuit has plainly stated that "there are two ways to divest a state of its Eleventh Amendment immunity, and hale the state into federal court. First, a state may waive its Eleventh Amendment immunity and consent to suit in federal court. Second, Congress can abrogate a state's immunity." Rudolph v. Adamar of N.J., 153 F.Supp.2d 528, 540 (D.N.J. 2001) (internal quotations and citations omitted); see MCI, 271 F.3d at 503; Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976) (the "Abrogation Exception"); Allen v. Fauver, 167 N.J. 69, 77 (2001) (the "Consent Exception"). The Supreme Court has also set forth the Waiver Exception that determines whether the state has waived its immunity by its litigation behavior. See Lapides v. Bd. of Regents of the Univ. Sys. of Ga., 535 U.S. 613, 619–24 (2002) (establishing the "Waiver Exception").

identifies the State as a potential defendant, <u>see</u> N.J.S.A. 10:5–5(e), and authorizes private suits "in Superior Court," <u>id.</u> 10:5–13, the State is immune to NJLAD claims in federal court. <u>See</u> <u>Garcia</u>, 210 F.Supp.2d at 550. Consequently, because "a plaintiff may not sue the State of New Jersey, or its alter egos, under the NJLAD in federal court," this Court lacks subject matter jurisdiction over Plaintiff's NJLAD claim against NJEDA, and Count II is dismissed. <u>See</u> <u>Garcia</u>, 210 F.Supp.2d at 550. In sum, pursuant to Eleventh Amendment, Plaintiff's claims against the NJEDA both under the ADEA and NJLAD are dismissed for lack of subject matter jurisdiction.

### A. Title VII

#### i. Racial Discrimination

In Count I of the Complaint, Plaintiff alleges that Defendant discriminated against her and created a hostile work environment on the basis of race in violation of Title VII. 42 U.S.C. § 2000(e)- 2(a)(1) provides in relevant part that "[i]t shall be unlawful employment practice for an employer— (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." To establish a *prima facie* case of discrimination, Plaintiff must prove: (1) she belongs to a protected class; (2) that she was qualified for the position; (3) that she suffered an adverse employment act; and (4) the adverse action occurred under circumstances that give rise to an inference of discrimination. <u>See</u> <u>Jones v. Sch. Dist. of Phila.</u>, 198 F.3d 403, 410–12 (3d Cir. 1999). For the purposes of the motion to dismiss, Defendant does not dispute that Plaintiff belongs to a protected class and was qualified for the position she held with NJEDA. Defendant's Brief in Support of Motion to Dismiss in Lieu of Answer ("Def. Br. in Supp. of Mot. to Dismiss"), at p. 14. Rather, Defendant argues that Plaintiff has not sufficiently alleged that she suffered an adverse

employment act, and that this action occurred under circumstances that give rise to an inference of discrimination.

Plaintiff's factual support for the alleged adverse employment actions are outlined in Paragraphs 8–28; and 33–34 of her Complaint. Compl. at ¶¶ 8–28; 33–34. Plaintiff alleges that supervisors ignored her, attempted to make her seem delinquent, and generally treated her differently and unfairly as compared to other compliance officers. Specifically, Plaintiff alleges that the work schedule rules were enforced against her, but not others; someone attempted to erase her work; and she was assigned tasks not related to her position. Plaintiff initially explains that she was not aware the reasons why she was subjected to these adverse employment actions. However, Plaintiff alleges that, almost one year into her employment, one of her supervisors, Ms. Marshall, departed from her unit, and another supervisor, who had allegedly been "unkind" to Plaintiff, replaced Ms. Marshall as Plaintiff's supervisor. After the replacement, Plaintiff claims that she received the epithet-containing text message. Compl. at ¶ 22. Soon thereafter, Plaintiff was terminated. Because of the text message, Plaintiff alleges that the prior adverse actions taken against her were as a result of her race.

Defendant concedes that Plaintiff's termination is sufficient to allege adverse employment action, but takes issues with the other conduct that Plaintiff alleges as race-based discrimination. Indeed, Plaintiff's termination, alone, constitutes an adverse employment action under Title VII. See Sawa v. RDG-GCS Joint Ventures III, No. 15-6585, 2017 U.S. Dist. LEXIS 109357 (E.D. Pa. July 14, 2017)("It is undisputed that Gemma's termination . . . constituted an adverse employment action for purposes of Title VII."); Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300-01 (3d Cir 1997)(finding that termination has been recognized as an adverse employment action in Title VII). In any event, Plaintiff's other allegations, i.e., examples of interference with her work, paint

a picture that she was allegedly subjected to a pattern of discriminatory behavior. Contrary to Defendant's argument, even if each of these alleged incidents does not constitute an adverse employment action on its own, it does not doom Plaintiff's discrimination claim, since Plaintiff has alleged her termination as an adverse employment event. As such, I find Plaintiff has sufficiently met her pleading requirement under this element.

Next, Defendant asserts that the circumstances surrounding the adverse employment action do not give rise to an inference of racial discrimination. In that regard, Defendant argues that there is no inference of racial discrimination because Plaintiff did not report any work-related issue to human resources. Further, Defendant contends that Plaintiff spoke with only one individual in human resources about the possibility of transferring, but did not divulge that she felt discriminated against by her supervisors. The Court summarily rejects Defendant's argument in this regard, because there is no requirement under Title VII that alleged raced-based incidents must be reported to human resources. Rather, this type of factual evidence may be used to undermine Plaintiff's claim before the factfinder. As such, this is not a basis to dismiss Plaintiff's Title VII claim at the pleading stage.

Finally, Defendant argues that the alleged incidents, including Plaintiff's termination, do not provide any inference of racial discrimination, because Plaintiff does not specifically identify who sent the text message or her basis for concluding that the message came from a supervisor. Def. Br. in Supp. of Mot. to Dismiss at 16. I also do not find this argument to be persuasive. On a Rule 12(b)(6) motion, Plaintiff need not allege chapter and verse all the factual details that underly her Title VII claim. Rather, it is sufficient that Plaintiff has alleged that the text message at issue was received on her work phone sent by a supervisor, and she provides the context in which she received the message. Compl. at ¶¶ 22–24. More specifically, the message allegedly

stated: "Now you're my [N****]."  It is reasonable to infer from the factual allegations that the sender was Plaintiff's newly appointed supervisor, since the message was sent following the departure of Plaintiff's prior supervisor.  More importantly, the context of the message suggests that this particular supervisor had previously harbored racial animus towards Plaintiff.  Thus, Plaintiff's allegation that the prior adverse actions taken against her — which appear to have been committed by a person with managerial authority — were plausibly based on race.  Taking those allegations as true, and affording Plaintiff all favorable inferences, I find that these facts reasonably give rise to an inference of racial discrimination.  See Castleberry v. STI Group, 863 F.3d 259, 263 (3d Cir. 2017); Davis v. City of Newark, 285 Fed. Appx. 899, 902 (3d Cir. 2008).

To conclude, I find that Plaintiff has sufficiently allege a Title VII discrimination claim.  Contrary to Defendant's arguments, Plaintiff's termination constitutes adverse employment action, and Plaintiff offers plausible allegations of her managers' discriminatory treatment during the course of Plaintiff's employment, including the most damning allegation that one of these supervisors sent a text message to Plaintiff containing a racial epithet.  And, Plaintiff has alleged that the adverse action occurred under circumstances that give rise to an inference of discrimination.  Accordingly, Defendant's motion to dismiss Plaintiff's Title VII discrimination claim is denied.

ii. **Hostile Work Environment**

Title VII prohibits employers from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2(a)(1). In Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993), the Supreme Court made clear that "this language is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment'

evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." Id. at 21 (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)) (internal quotation marks omitted). Stated differently, Title VII prohibits discriminatory conduct "that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Kokinchak v. Postmaster Gen. of the United States, 677 Fed. Appx. 764, 766 (3d Cir. 2017) (quoting Harris, 510 U.S. at 21). A claim alleging that sort of discrimination "is referred to as a hostile work environment claim." Kokinchak, 677 Fed. Appx. at 766.

To establish a *prima facie* case of a hostile work environment based on racial harassment, Plaintiff must prove: (1) she suffered intentional discrimination because of her race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would negatively affect a reasonable person; and (5) respondeat superior liability exists. See Jensen v. Potter, 435 F.3d 444, 449 & n.3 (3d Cir. 2006); Castleberry, 863 F.3d at 263. Importantly, "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at '*discriminat[ion]*' based on plaintiff's membership in a protected class, including race. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (emphasis in original); see Lacy v. Nat'l R.R. Passenger Corp., 254 Fed. Appx. 934, 936 (3d Cir. 2007). As a result, "[v]erbal and physical harassment, no matter how unpleasant and ill-willed, is simply not prohibited by Title VII if not motivated by the plaintiff's [race]." Koschoff v. Henderson, 109 F. Supp. 2d 332, 346 (E.D. Pa. 2000), aff'd sub nom. Koschoff v. Runyon, 35 Fed. Appx 357 (3d Cir. 2002). Moreover, in order for harassment to be cognizable, it must be "'sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working

environment.'" <u>West v. Philadelphia Elec. Co.</u>, 45 F.3d 744, 753 (3d Cir. 1999)(quoting <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 67 (1986)).

Here, Defendant only disputes the first two elements. With respect to those elements, Plaintiff alleges that the purported mistreatment she experienced at NJEDA arose from racial animus. To that end, Plaintiff avers that she suffered racial harassment at her unit, alleging that supervisors attempted to make her seem delinquent, did not give her credit for her work, ignored her, and one supervisor sent her a text message containing a racial epithet. Plaintiff claims that these actions taken together demonstrate a pattern of harassment based on her race.

Defendant argues that those allegations are not sufficient for two reasons: first, the Defendant argues that the sum total of the alleged incidents — excluding the text message — do not give rise to an inference of racial animus; second, Defendant maintains that while the text message may give rise to an inference of racial animus, the allegations of mistreatment, nevertheless, do not satisfy the severe or pervasive prong of a hostile work environment claim. Def. Br. in Supp. of Mot. to Dismiss at 10.

As to its first contention, Defendant cites <u>Davis v. City of Newark</u>, 285 Fed. Appx. 899. 901-02 (3d Cir. 2008), for the general proposition that allegations that cannot be reasonably construed as invoking any racial feeling do not support Title VII liability. That case is not helpful to Defendant's position. The plaintiff in <u>Davis</u> based her hostile work environment claim on several incidents that the court found to implicate her personality, temperament, and other various factors rather than racial issues. <u>See</u> <u>id.</u> at 902–03. While some conduct was "race conscious," it was "not in and of itself discriminatory." <u>Id.</u> at 902. The court found that plaintiff could "not sustain a claim by asserting an event and then asserting that it was motivated by racial bias." <u>Id.</u> at 903.

Unlike <u>Davis</u>, here, Plaintiff's supervisor allegedly used a racial epithet in a text message. Certainly, when a racial epithet is used in the workplace, there is an inference of racial animus. Defendant does not dispute this fact. And, to be sure, Plaintiff's allegation that she received an epithet-containing text message from a supervisor, alone, is sufficient to state a claim for racial harassment under Title VII. <u>See</u> <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998)(finding that even one isolated incident of harassment can support a claim under Title VII)[8]; <u>Castleberry</u>, 863 F.3d at 263 (same); <u>Ascolese v. Southeastern Pa. Transp. Auth.</u>, 925 F. Supp. 351, 360 (E.D. Pa. 1996)(finding that a single incident of harassment, if extremely serious, can support a Title VII claim); <u>McCauley v. White</u>, No. 01-4071, 2002 U.S. Dist. LEXIS 13036, at *11-12 (E.D. Pa. May 21, 2002)(same); <u>see</u> <u>also</u> <u>Boyer-Liberto v. Fontainebleau Corp.</u>, 786 F.3d 264, 277-78 (4th Cir. 2015)(finding that a single incident involving an "extremely serious" racial epithet could establish a racially hostile work environment); <u>Streater v. City of Camden Fire Dept.</u>, 567 F.Supp.2d 667, 673–74 (D.N.J. 2008) (denying motion for summary judgment on the basis that a jury could reasonably find that the plaintiff was the victim of harassment on account of his race after supervisor made references to violent invocation of race wars and racial jokes); <u>Francis v. Atlas Machining & Welding, Inc.</u>, No. 11-6487, 2013 U.S. Dist. LEXIS 20691, at *5 (E.D. Pa. Feb. 15, 2013) ("Repeated use of the racial epithet ['n*****'] may support a finding of severe or pervasive harassment."); <u>EEOC v. Bimbo Bakeries USA, Inc.</u>, No. 09-1872, 2010 U.S. Dist. LEXIS 13654, at *5 (M.D. Pa. Feb. 17, 2010) ("[T]he use of racial epithets — especially the word ['n*****,'] which has a long and sordid history in this country can quickly change the atmosphere, environment, and culture of a workplace from positive to poisonous.").

---

[8]     Although <u>Faragher</u> involved hostile work environment claims based on sexual harassment under Title VII, those claims are reviewed under the same standard as Title VII racial harassment. <u>See</u> <u>National R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 115–16 (2002).

Moreover, with regard to other incidents of harassment, i.e., interference with Plaintiff's work performance, Plaintiff alleges that they were also based on race because of the text message she received. While Defendant argues that Plaintiff has failed to sufficiently allege that those incidents do not give rise to an inference of racial animus, I have already determined, albeit in the context of racial discrimination, that Plaintiff has plausibly alleged that the various actions taken against her were because of her race. Indeed, as I indicated, supra, once Plaintiff allegedly received the untoward message containing the derogatory racial remark from a supervisor on her work cellphone, it can be reasonably inferred — and Plaintiff has so alleged — that the other incidents were also related to her race. Thus, Plaintiff plausibly alleges that other acts are "part of a complex tapestry of [racial harassment] when examined in conjunction with" the text message. Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996); see also Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005)(holding that analysis regarding a hostile work environment claim must concentrate "on the overall scenario.") Accordingly, Plaintiff has sufficiently alleged the first element of a hostile work environment claim.

Second, Defendant argues that Plaintiff's claims fail to satisfy the severe or pervasive element. In that respect, while Defendant concedes that the text message is unquestionably offensive, it nevertheless argues that Plaintiff has not pled the isolated text message to be so extreme as to amount to a change in the terms and conditions of her employment. I do not agree. The disjunctive "severe or pervasive" requirement examines all of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Harris, 510 U.S at 22. In measuring the severity of harassing conduct, the status of the harasser may be a significant factor — e.g., "a supervisor's use of [a

racial epithet] impacts the work environment far more severely than use by co-equals." <u>Rodgers v. W.-S. Life Ins. Co.</u>, 12 F.3d 668, 675 (7th Cir. 1993); <u>Boyer-Liberto</u>, 786 F.3d at 278. Simply put, "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character." <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 763 (1998).

Here, Plaintiff does not allege that the text message came from a co-worker; rather, the message was allegedly sent by a supervisor. As the case law makes clear, the dynamic between a supervisor and a subordinate in the context of a harassment claim is significant; that is, a racial epithet coming from a supervisor is regarded as a severe threat sufficient to impact an employee's work performance and to change his/her work environment. As such, I find Defendant's argument in this regard lacks merit. Defendant's remaining argument centers around Plaintiff's purported inability to prove the sender of the text message, and thus, Defendant criticizes Plaintiff for being overly speculative. However, as I have previously stated, Defendant's argument amounts to an attack of insufficient evidence, which is inappropriate on a dismissal motion. Instead, taking Plaintiff's allegations as true, she has sufficiently alleged the severe and pervasive element of the harassment claim.

Accordingly, Defendant's motion to dismiss Plaintiff's Title VII hostile work environment claim is denied.

## IV.    **CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss Plaintiff's claims against NJEDA pursuant to the NJLAD, NJCRA, § 1983, and ADEA is granted; those particular claims are dismissed with prejudice.  Defendant's motion to dismiss Plaintiff's Title VII claims, including racial discrimination and harassment, is denied.


Dated:  July 30, 2018

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
United States District Judge
