**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LUDE JASMIN, | Civil Action No. 16-1002 (FLW) |
| Plaintiff, | |
| v. | |
| NEW JERSEY ECONOMIC DEVLOPMENT AUTHORITY, | **OPINION** |
| Defendant. | |

**WOLFSON, Chief Judge**:

Plaintiff Lude Jasmin ("Jasmin" or "Plaintiff") was terminated from her job with the New Jersey Development Authority ("NJEDA" or "Defendant") in December 2014. In her Complaint, Jasmin alleges that the work environment at NJEDA, as well as NJEDA's decision to terminate her, violate various federal and state antidiscrimination laws. After granting, in part, NJEDA's Motion to Dismiss,[1] what remains is Jasmin's employment discrimination claim under Title VII of the 1964 Civil Rights Act ("Title VII"). *See* 42 U.S.C. § 2000e-2(a). Following discovery, NJEDA has moved for summary judgment pursuant to Fed. R. Civ. P. 56, contending that the evidence fails to show a hostile work environment or that Jasmin was terminated because of her race. For the following reasons, Defendant's motion for summary judgment is **GRANTED**.

---

[1] The Court dismissed Counts II, III, IV, and V with prejudice, and permitted only Count I to proceed.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]

In 2013, Jasmin worked for Solix, a company that provided temporary employment services. Def.'s Statement of Undisputed Facts ("Def.'s SUMF") ¶ 1. At that time, the NJEDA used Solix to staff the Superstorm Sandy relief project. *Id.* ¶ 2. On January 28, 2014, Jasmin was hired by the NJEDA directly, as a compliance officer. *Id.* ¶¶ 4, 7. Jasmin was informed at the outset that her employment was at-will. *Id.* ¶ 4. As a compliance officer, Jasmin's duties included reviewing applications for aid from businesses that suffered damage during Hurricane Sandy, recommending whether they should be granted, and advising other employees of the relief program's policies, which changed often. *See id.* ¶¶ 11–13; Def.'s SUMF, Ex. C, at 68:10–12, ECF No. 68–2; Def.'s SUMF, Ex. A, at 31:22–25, 32:15–33:1, 41:10–13, ECF No. 68-1. When Jasmin began working for NJEDA, Meredith Marshall supervised her. *See* Def.'s SUMF, Ex. A, 46:15–47:7. Jasmin described Marshall as "excellent." *See* Def.'s SUMF, Ex. C, 17:14. Marshall left in April 2014, and Obi Ikeme ("Ikeme") and Jaclyn Cohen ("Cohen") replaced her. *See* Def.'s SUMF ¶¶ 16, 18; Def.'s SUMF, Ex. A, at 48:19–49:7. Later that year, on December 12, 2014, Bruce Ciallella ("Ciallella"), the then-Grant Program Director, terminated Jasmin. Def.'s SUMF ¶ 139. Jasmin contends that, during her time at NJEDA, her supervisors—in particular Cohen—created a hostile work environment and Ciallella terminated her because of her race. The Court accepts

---

[2]    The Court largely accepts the facts set forth in Defendant's Statement of Undisputed Material Facts as undisputed, because Plaintiff failed to respond to Defendant's Statement of Material Facts, as required by Local Civil Rule 56.1(a). *See* L. R. Civ. 56.1(a) ("[A]ny material fact not disputed shall be deemed undisputed for the purposes of the summary judgment motion."); *see also Breitman v. Nat'l Surety Corp.*, No. 14-7843, 2018 WL 1542151, at *6 (D.N.J. Mar. 29, 2018) ("The consequence of Plaintiff's unexplained failure to follow the clear command of L. Civ. R. 56.1(A) by filing a responsive statement of material facts addressing each factual assertion in [defendant's statement of undisputed facts] is that the Court will accept Defendant's facts as established."). Plaintiff did submit a separate statement of undisputed facts that mainly addresses facts surrounding her receipt of a racist text message, discussed *infra*.

the following facts, which Jasmin claims substantiate her Title VII claims, as undisputed for the purposes of summary judgment.

Jasmin highlights a number of incidents in 2014 that, she argues, taken together, make out a prima facie case of a hostile work environment. First, Jasmine claims that her supervisors set aside certain files she submitted, rather than reviewing them, and this began as soon as she started at NJEDA in January 2014. *See* Def.'s SUMF, Ex. C, 18:6–11, 18:12–14. It appears that Jasmin submitted the unreviewed files while at Solix, sometime in the winter of 2013, and the files "did not transfer" to NJEDA's internal, master list. *See* Def.'s SUMF, Ex. A, at 59:6–10, 78:23–24; Def.'s SUMF, Ex. C, at 20:12–18, 23:25–24:3, 27:6–13.

Moreover, Jasmin claims that, once Ikeme and Cohen began assigning files, they assigned fewer to her than to other compliance officers. *See* Def.'s SUMF, Ex. A, at 61:10–16. This occurred before Marshall left in April 2014. However, Jasmin had a number of files in her queue around that time (as many as 42, although the record is unclear as to exactly when Jasmin maintained that many), did not have personal knowledge of whether other officers had more than she, and never heard anyone complain about getting too many files. *Id.* at 52:9–19, 63:11–24. Jasmin also testified that "[n]obody was complaining about not getting files," she was not "the only person not getting files," *id.* at 61:21–62:4, and "everybody was not being assigned files," *id.* at 78:25–79:1, yet "[e]verybody else was complaining," including two officers who were eventually promoted ahead of her, Lisa Briggs and David Guarini. *Id.* at 64:9–15. Generally, files were assigned as applications were submitted, *see id*. at 63:4–7, and Ikeme and Cohen eventually distributed them faster. *Id.* at 65:10–14. At the same time, Jasmin described herself as extremely busy when she began at NJEDA: "when I first started out . . . I was doing everything," and "you had to wear many hats, doing whatever was necessary." *See* Def.'s SUMF, Ex. A, 40:4–9. In fact, around that time,

3

Jasmin admitted telling another employee that her apparently still-unreviewed Solix files should be assigned to new hires because she had enough work in her queue and did not need more. *See* Def.'s SUMF, Ex. C, at 28:13–21. Jasmin testified that she does not believe Marshall treated her differently because of her race, *see* Def.'s SUMF, Ex. A, at 111:12–13, nor that Ikeme and Cohen assigned her fewer files because of her race. *Id.* at 112:12–13.

Next, sometime before April 2014, Jasmin claims that Marshall paired up compliance officers to submit files for review, after experimenting with a different file assignment system that Jasmin implies did not work well. *See* Def.'s SUMF, Ex. C, at 29:23–30:8. Later on, Ikeme instructed Guarini, Jasmin's partner, to sign off on Jasmin's files. *Id.* at 35:14–15. Jasmin does not know why Marshall implemented the tandem system, but suggested in her deposition that "maybe she didn't have as much control over [officers] . . . as she thought she would because they were not following [directions]." *Id.* at 30:12–15. Aside from her Solix files, it appears that Ikeme and Cohen did not fail to review any other files Jasmin submitted while at NJEDA. *Id.* at 21:4–22:20. Jasmine testified that she does not believe her files were not reviewed because of her race, *see* Def.'s SUMF, Ex. A, at 80:7–10; Def.'s SUMF, Ex. C, at 31:12–18, that Marshall implemented the tandem system for race-based reasons, *see* Def.'s SUMF, Ex. C, at 30:12–31:7, or that Ikeme told Guarini to sign off on her files on the basis of race, *id.* at 35:11–15. Jasmin further testified that Guarini received credit for her work, because he signed off on her files, and was consequently promoted ahead of her. *Id.* at 34:6–11, 40:25–41:14. Jasmin alleges that Briggs, another white employee, was also promoted first. *Id.* at 40:41:3–4. Jasmine apparently had more experience than Guarini, but it is not clear how much more or the extent to which seniority was a factor in NJEDA's promotion decisions. *Id.* at 37:6–38:23; 41:7–9.

In addition, Jasmin asserts that Ikeme and Cohen did not assign her complex files, instead

assigning them to new hires. *See* Def.'s SUMF, Ex. A, at 66:18–67:4; 73:20–23. However, Jasmin does not have personal knowledge of the types of files other officers received. *Id.* at 67:22–68:8 ("I'm not privy to the file."). She only observed that "at some time I was given files and then, like, easy file, one, two, three." *Id.* Moreover, while she heard from other employees five or six times that complex files went to other officers, *id.* at 73:5–13, those employees did not know which officers received which files, and merely believed that certain files should have gone to Jasmin or another more senior officer, Vincent Mann. *Id.* at 73:14–23. Jasmin never asked her supervisors for harder files, *id.* at 72:6–20, and admitted in her deposition that "when a file comes in, you don't know . . . how complex it is unless you dig into the file." *Id.* at 75:20–22, 76:2–4. Jasmin does not believe that Ikeme and Cohen assigned her easy files because of her race. *Id.* at 76:12–25.

Jasmin also testified that Cohen refused to make eye contact with her, closed the door on her, giggled at her, and would not say good morning to her. *See* Def.'s SUMF, Ex. A, at 81:16–83:20. Jasmin explained that, at first, she did not believe Cohen acted this way because of her race. *Id.* at 83:16–20; Def.'s SUMF, Ex. C, at 86:16–20 ("I didn't think that way."). It seemed to be "a millennial thing." *See* Def.'s SUMF, Ex. A, at 81:8–11. Indeed, Jasmin overheard a manager seemingly refer to Cohen while complaining about people under thirty, who "have no people skills," and a secretary, who is white, complaining that Cohen would not say good morning to her. *See* Def.'s SUMF, Ex. C, at 90:3–20. From Jasmin's perspective, Cohen's behavior also could have reflected the way in which a supervisor has to "do things differently." *Id.* at 82:20–21. Jasmin stated that Cohen likewise second-guessed her work, but that "[w]hen it comes to that, she does that to everyone." *Id.* at 91:16–19. While Cohen *did* markup Jasmin's files more than other officers' files, she did so, Jasmin suggests, because Jasmin would use French words "not . . . in our English vernacular." *Id.* at 92:8–19, 93:20–23.

Additionally, Jasmin asserts that two other black employees were terminated before she, but that no white employee was terminated. *See* Def.'s SUMF, Ex. A, at 113:4–6, 120:12–15. She does not know who made the decision to terminate the black employees, *id.* at 115:14–17, why they were terminated, *id.* at 115:16–116:11, if they produced high quality work, *id.* at 119:7–13, if they were in fact terminated or left voluntarily, *id.* at 113:15–114:8, or if they worked in her department at all, *id.* at 123:4–8. However, Jasmin testified that she was the only black employee in her department, aside from one of her supervisors, Ikeme. *See* Def.'s SUMF, Ex. C, at 14:9–10. Jasmin was friendly with one of the employees, Sandra, who she claims was fired. But Jasmin does not know whether Sandra was treated differently based on her race, and, indeed, Jasmin did not witness any discrimination against Sandra. *Id.* at 120:16–121:17. She also intimated that Ikeme was treated differently because of her race, but cannot recall any specific examples. *See* Def.'s SUMF, Ex. A, at 145:2–5.

Jasmin testified that human resources denied her request to transfer to another department, once in the fall of 2014 and two other unspecified times as well. *See* Def.'s SUMF, Ex. A, at 129:11–19. While Jasmin never complained about discrimination when she sought the fall transfer, *id.* at 126:6–14, she mentioned both that her work was slow and her department was "hellish." *See* Def.'s SUMF, Ex. C, at 10:22–11:7. Jasmin explained that she did not bring up discrimination because she was advised by a coworker, Judy Kinslow, not to complain when seeking a transfer. *See* Def.'s SUMF, Ex. A, at 130:20–131:7. Kinslow was not Jasmin's supervisor or a human resources officer. *Id.* at 131:8–10. Human resources eventually denied Jasmin's transfer, because she had not been an employee for a year, which Jasmin understood to be the department's policy. *Id.* at 131:17–23. Indeed, Jasmin could not recall any instance where an employee was able to transfer before the one-year mark. *See* Def.'s SUMF, Ex. C, at 16–19.

6

Jasmin further recounts an incident where a secretary asked her to take out the trash at a work party for a departing employee. *See* Def.'s SUMF, Ex. A, 135:12–25. Jasmin entered the break room carrying a cake five minutes before the party began. *Id.* at 135:20–25. Three employees were there: Ikeme, Lori Matheus, NJEDA's lawyer at the time, and Matheus' secretary, Patty Rush. *Id.* at 136:8–17. Rush then asked Jasmin to take out the trash, which had been left in the room from a prior party. *Id.* at 136:15–17, 137:17–19. Jasmin does not know whether Rush asked her to take out the trash because of her race. *Id.* at 138:4–139:8 ("You ask her . . . . I can't read her mind."). However, Jasmin believes that Rush knew "what[] [was] going on at work" because she was part of a "group of people who talk[ed] about . . . .things," and Rush apparently became distant when Cohen became supervisor. *Id.*

Jasmin alleges various other instances of differential treatment to support her hostile work environment claim. For example, soon after she started at NJEDA, her status updates regarding her work were deleted from the master file, which compliance officers would use to communicate their progress to supervisors. *See* Def.'s SUMF, Ex. C, 46:7–18. According to Jasmin, only supervisors could make such changes. *Id.* at 46:23–47:1. Jasmin informed Marshall, who said that she would take care of it. Jasmin's updates stopped disappearing sometime thereafter. *Id.* at 50:1–7. However, Jasmin testified that she does not believe her updates were erased because of her race. *Id.* at 50:17–19. Jasmine also asserts that, on two occasions, Cohen did not let her leave work early, *see* Def.'s SUMF, Ex. C, 50:20–51:18, but let Briggs, a white female, leave early often. *Id.* at 52:24–53:2. However, Jasmin is not aware of the reason why. *Id.* at 53:3–6, 53:17–21. Nor does Jasmin know whether Cohen denied her requests to leave early because of her race, but it appears she doubts that was the reason. *Id.* at 54:8–15, 55:5–17 ("I don't go instead somebody's head to figure out why they do what they do . . . . I wasn't in the habit of saying . . . Oh, my goodness,

she's doing that maybe because I'm black."). Moreover, Jasmin claims that Ciallella did not use her first name in two emails to her, but used other officers' first names when he would write to them. *Id.* at 74:6–76:13. Jasmin does not know whether Ciallella did not use her first name because of her race. *Id.* at 78:5–12.

Jasmin's most serious claim of discriminatory treatment is a racist text message on her work phone allegedly stating: "Now you're my [N*****]." *See* Ex. C, 63:20–21. Jasmin believes that Cohen sent it, but admitted during her deposition that it is "a matter of opinion" and that she "would apologize" if she is wrong. *See* Ex. A, 103:18–20. Jasmin testified that she did not believe Cohen treated her differently because of her race, until she received the text, which caused her to reexamine Cohen's past behavior. *Id.* at 103:5–104:5, 111:19–24. In her deposition, Jasmin conceded that she did not recognize the number from which she received the text, *see* Ex. A, 86:12, did not use her work phone to communicate with people at work, *id.* at 86:14–87:2, had never been contacted on her work phone by a supervisor before, *id.* at 87:20–88:4, did not know her supervisor's number, *id.* at 87:20–24, did not respond to the text, *id.* at 90:4–8, and did not tell anyone in human resources about the text, *id.* at 90:9–92:6.[3] Jasmine states that she received the text not "the next month after [Marshall] left," but maybe "two or three months" later, likely in the summer of 2014. *Id.* at 98:14–99:12. Ikeme was no longer with NJEDA at that time. *Id.* at 101:10–19. Jasmine admitted that she did not attempt to find Cohen's number in the work directory, or anywhere else, to confirm whether Cohen sent the text, *id.* at 101:20–24, and that someone else could have texted her by mistake, but that only "somebody who's my supervisor, somebody who's above me . . . would say something like that." *Id.* at 102:12–16. Jasmin testified that she never

---

[3]     Jasmin testified that she did tell two coworkers—Judy Kinslow and Jody Camarra—about the text. *See* Def.'s SUMF, Ex. A, 94:12–18. But it does not appear that she deposed either of them in this litigation or otherwise sought testimony from them regarding her receipt of the text.

received another text on her work phone. *Id.* at 107:1–2. Moreover, she apparently tried to save the text by taking a picture of it but "it disappeared," at which point her phone flashed red and notified her to "contact [her] administrator." *Id.* at 107:6–108:7.

Finally, Jasmin claims that, on December 12, 2014, Ciallella terminated her because of her race. According to Defendant, however, Ciallella terminated Jasmin because she was an at-will employee, the relief program was winding down, and she processed files slowly and had difficulty staying abreast of policy changes. *See* Def.'s SUMF, Ex. H. A white employee, apparently from a different department, was terminated on the same day. *See* Def.'s SUMF, Ex. J; Def.'s SUMF, Ex. C, at 103:15–104:10. Jasmin testified that she knew from the time she was hired that she was an at-will employee. *See* SUMF ¶ 5; Def.'s SUMF, Ex. C, at 67:15–25 ("That's the New Jersey law, so . . . yes."); *id.* at 68:4–6. She understood that to mean she could be "terminated, you know, based on whatever." *See* Def.'s SUMF, Ex. C, 68:10–12. She also understood her position to be temporary based on her contract, *see* Def.'s SUMF, Ex. A, at 38:11–20; Def.'s SUMF, Ex. C, at 69:13–25 ("[The contract] was at will, as an at-will employee. I know what it meant."), her job description, and the fact that applications for aid would eventually cease because the relief program would end. *See* Def.'s SUMF, Ex. A, at 39:1–6 ("Well, because the Sandy project . . . it wasn't gonna be permanent . . . . You understood it was a Sandy project."); *id.* at 122:14–18.

Jasmin filed her Complaint in this Court on February 16, 2016, alleging five counts of employment discrimination in violation of the following statutes: Title VII of the 1964 Civil Rights Act, the New Jersey Law Against Discrimination, the New Jersey Civil Rights Act, 42 U.S.C. § 1983, and the Age Discrimination in Employment Act. On December 4, 2017, NJEDA moved to dismiss the Complaint, which this Court granted in part and denied in part. Specifically, the Court dismissed Counts II, III, IV, and V with prejudice. Before the Court is NJEDA's Motion for

Summary Judgment on Count I, the employment discrimination claim under Title VII. Jasmin opposes the motion.

## II. STANDARD OF REVIEW

A court will grant summary judgment if there is no genuine dispute over material facts and the moving party is entitled to judgment as a matter of law. *See* F.R.C.P. 56(a). A fact is material if a dispute over it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Neither unnecessary or irrelevant factual disputes, nor facts that are "merely colorable" or "not significantly probative," will preclude summary judgment. *Id.* at 249-50. "The mere existence of a scintilla of evidence in support of the plaintiff's position" is also "insufficient." *Id.* at 252 ("[T]here is a preliminary question left for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it."). A dispute is genuine if a reasonable jury could decide the dispute in favor of the nonmoving party. *Id.* at 251. The question, in short, is whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law," *id.* at 251-52, and in making that determination, a court will draw all reasonable inferences in favor of the nonmoving party. *See Berner Int'l Corp. v. Mars Sales Co.*, 987 F.2d 975, 978 (3d Cir. 1993); *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

The party seeking summary judgment must first "inform[] the . . . court of the basis for its motion, and . . . demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In doing so it may simply "point[] out to the district court . . . an absence of evidence to support the nonmoving party's case." *Id.* 325. It need not "produce evidence showing the absence a genuine issue of material fact," *id.*, or "negate the opponent's

claims," *id.* at 323. Once the moving party meets this burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). It must point to evidence in the record demonstrating that "a rational trier of fact" could find in its favor. *Id.* at 587. The nonmoving party cannot rely on its pleadings to meet its burden. *Celotex*, 477 U.S. at 324 ("Rule 56(e) requires the nonmoving party to go beyond its pleadings . . . [and] designate specific facts showing that there is a genuine issue for trial."); *Anderson*, 477 U.S. at 257 (noting that a party resisting summary judgment "must present affirmative evidence in order to defeat a properly supported motion"); F.R.C.P. 56(e) (stating that the purpose of summary judgment is to "pierce the pleadings and to assess the proof"). The nonmoving party must instead "make a showing sufficient to establish the existence of an element essential to [its] case." *Celotex*, 477 U.S. at 322. If it cannot make a sufficient showing with respect to any element, a court may grant summary judgment, because "a complete failure of proof concerning an essential element [on which the party will bear the burden at trial] . . . necessarily renders all other facts immaterial." *Id.* at 323. Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of facts for the purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Finally, the Court will consider a fact as undisputed for purposes of summary judgment if the non-moving party fails to object that the evidence does not properly support the moving party's fact. *See* Loc. R. Civ. P. 56.1(a). In other words, the Court will conclude that a fact is undisputed unless the nonmoving party explicitly disputes it and either identifies contradictory evidence in the record or demonstrates that the moving party does not have admissible evidence to support it.

## III. DISCUSSION

In Count I of her Complaint, Plaintiff asserts that Defendant created a hostile work environment and terminated her based on her race, in violation of Title VII. Defendant challenges the factual basis of Plaintiff's claims under this provision, contending that Plaintiff has not presented any evidence on which a reasonable jury could find for her on either claim. Specifically, Defendant argues that no reasonable jury could conclude by a preponderance of the evidence that Plaintiff has made out a prima facie case of discrimination.

Section 2000e-2(a) of Title 42 states that it shall be unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *See also Whitmire v. Kvaerner Philadelphia Shipyard*, 340 Fed. Appx. 94, 97 (3d Cir. 2009). In a Title VII case such as this one, a plaintiff "has the burden of proving by the preponderance of the evidence a prima facie case of discrimination." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the plaintiff does so, "the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for [its action]." *Burdine*, 450 U.S. at 253. Should the defendant meet that burden, the plaintiff may then "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.*; *Mcdonnell Douglas*, 411 U.S. at 804. At summary judgment, the Court is guided by this "substantive evidentiary burden," *see Anderson*, 477 U.S. at 243, 254, and asks whether, based on the record, a reasonable jury applying the "preponderance of the evidence" standard could find that Plaintiff faced discrimination because of her race.

A. *Hostile Work Environment Claim*

Title VII's text, which makes it unlawful for an employer "otherwise to discriminate" against any individual "with respect to . . . conditions . . . of employment," prohibits employers from subjecting employees to a "hostile or abusive environment" that "occurs over a series of days or perhaps years." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-116 (2002). To defeat a summary judgment motion on a hostile work environment claim, a plaintiff must present evidence showing a genuine dispute of material fact on five elements: "(1) she suffered intentional discrimination because of her race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would negatively affect a reasonable person in [ ] her position; and (5) respondeat superior liability exists." *Harper v. Tyco Electronics Corp.*, 804 F. Supp. 2d 159, 163 (3d Cir. 2011). Defendant argues that Plaintiff has failed to present evidence supporting the first, second, fourth, and fifth elements.

To establish a prima facie case of intentional discrimination under the first element, a plaintiff must present evidence showing that the differential treatment she alleges "arose from racial animus." *Id.* at 163. The Third Circuit has emphasized that, in Section 2000e-2(a) cases, it is "improper to isolate incidents of facially neutral harassment and conclude, one by one, that each lacks the required discriminatory animus." *Jensen v. Potter*, 435 F.3d 444, 450 (2006), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Instead, to determine whether a plaintiff has presented sufficient evidence supporting her hostile work environment claim, "the record must be evaluated as a whole." *Cardenas v. Massey*, 269 F.3d 251, 261 (3d Cir. 2001); *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 149 (3d Cir. 1999) ("[A] discrimination analysis must concentrate not on individual incidents, but on the overall scenario."); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) ("Whether an environment

is 'hostile' . . . can be determined only by looking at all the circumstances."). This is the manner in which a jury "would be entitled to view the evidence." *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 285 (3d Cir. 2001) (declining to consider the record "in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence").

Finally, Defendant is correct that Title VII is not "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 80–81 (1998). But, it is equally true that "Title VII tolerates no racial discrimination, subtle or otherwise." *McDonnell Douglas*, 411 U.S. at 801. Moreover, discriminatory conduct has not been eradicated from the workplace, yet sophisticated violators "have learned not to leave the proverbial 'smoking gun' behind," making it harder but no less imperative to weed out unlawful behavior. *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir. 1996) ("It has become easier to coat various forms of discrimination with the appearance of propriety, or to ascribe some other less odious intention to what is in reality discriminatory behavior."). Courts must be "increasingly vigilant in their efforts to ensure that prohibited discrimination is not approved under the auspices of legitimate conduct," and to ensure that "a plaintiff's ability to prove discrimination indirectly, circumstantially, [is not] crippled." *Id.* (internal quotations omitted).

Here, Plaintiff alleges various instances of differential treatment that, she claims, taken together, prove that Defendant intentionally discriminated against her because of her race. Plaintiff's assertions have been recounted in detail, *supra*. To summarize: 1) Plaintiff was not assigned as many files as other officers, 2) when she was assigned files they were not complex or reviewed in a timely manner, 3) another officer signed off on her work, 4) she was not promoted, 5) her supervisor treated her unprofessionally, 6) she was asked to take out the trash on one occasion it was not part of her job description, 7) she was not allowed to leave work early, 8)

14

Ciallella did not use her first name in emails, 9) her status updates were erased from the master file, 10) she was denied a request to transfer to another department, and 11) she received a racist text message on her work phone. Even viewing the undisputed facts in a light most favorable to Plaintiff, a reasonable jury could not find by a preponderance of the evidence that there was any intentional discrimination at play. Notwithstanding the text message, Plaintiff has failed to offer any evidence of a nexus between the treatment she details in her deposition and her race, and no reasonable factfinder could infer racial animus from the record as it stands. *Compare Harper*, 870 F.3d at 163 ("[Plaintiff] fails to . . . establish[] a nexus between [the] conduct and [her] race."), *with Aman*, 85 F.3d at 1083 ("[R]ace was a substantial factor in the harassment, and [] if the plaintiff had been white she would not have been treated in the same manner.").

The evidence supporting many of Plaintiff's claims of differential treatment is simply nonexistent. Plaintiff presents no evidence that Ciallella did not use her first name in emails—or, if he did not, that he singled her out. In fact, Defendant presents evidence that Ciallella did not commonly use anyone's first name in emails, which tends to negate this claim. *See* Def.'s SUMF ¶ 138. Plaintiff additionally fails to show that the one-year transfer policy was not universally applied, or that she was targeted for enforcement because of her race. And, more importantly, she could not recall a single instance in which an employee of any race received a transfer before they had been with NJEDA for at least one year. *See* Def.'s SUMF, Ex. C, 16–19. Plaintiff also fails to show that the two black employees, who were allegedly fired before her, worked in her department at all, much less were actually fired. Even if Plaintiff made such a showing, there is no evidence whatsoever of the factual circumstances surrounding those terminations, or of the role race played in them (if any). Plaintiff similarly fails to support her allegation that Ikeme was treated differently because she is black with any examples of discrimination. *See* Def.'s SUMF, Ex. A, 145:2–5.

15

Moreover, there is no evidence that Plaintiff's status updates disappeared from the master file because a supervisor deleted them out of racial animus, nor evidence that Cohen denied her requests to leave early based in any part on her race. Finally, Plaintiff cannot support her claim that she was not assigned as many files as other officers without even the "scintilla" of evidence that she processed files at the same rate as them. *See* Def.'s SUMF, Ex. A, 55:1–7 ("I don't know how long it takes them to review a file. I really don't."). As to these claims of differential treatment, the record is devoid of any evidence on which a reasonable jury could infer intentional discrimination.

Plaintiff presents only hearsay evidence in support of two other claims of differential treatment. For example, the only evidence supporting her claim that she was assigned easier rather than complex files is a vague reference, at her deposition, to statements made by other employees, who themselves lacked personal knowledge of the behavior they described to Plaintiff. *See* Def.'s SUMF, Ex. A, 73:5–23. Even so, Plaintiff admits that her supervisors would not have known about which files were easier and which were not unless they investigated them closely. *Id.* at 75:20–22, 76:2–4. The same is true for Plaintiff's claim that a secretary, in asking her to take out the trash, intended to signal agreement with "what [was] going on at work," *i.e.*, a conspiracy among the supervisors to mistreat Plaintiff based on her race. The only evidence supporting that claim is that the secretary may have overheard unspecified racist gossip between Cohen and Matheus, then the relief program's lawyer, apparently in Matheus' office, at unspecified times. *See id.* at 140:10–15, 138:15–18, 138:22–25 ("There's a group of people who talk about several things. There are certain people, they know what's going on at work.").

Defendant argues that Plaintiff's hearsay evidence should not be considered at summary judgment because it is not in admissible form. That is a misstatement of the case law. *See, e.g.*,

16

*Celotex*, 477 U.S at 324 ("Rule 56 does not require a nonmoving party to depose her own witnesses."). Still, for such evidence to be considered, Plaintiff must demonstrate that she will *be able to* reduce it to an admissible form at trial. *See, e.g.*, *Fraternal Order of the Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016); *Celotex*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."). She has not done so, because she has not "explained the admissible form that is anticipated" and because it is not at all clear that her witnesses have any personal knowledge of the behavior she describes. *Fraternal Order of the Police*, 842 F.3d at 238–39 (holding that hearsay had been reduced to an admissible form when "[p]laintiffs identified the out-of-court declarants . . . and noted their availability to testify"); *Read v. Profeta*, 397 F. Supp. 3d 597, 645 (D.N.J. 2019) (noting that courts may disregard parts of affidavits that are not based on personal knowledge); *Watkins v. Wells Fargo Bank, N.A.*, No. 15-5712, 2017 WL 2399086, at *4 n.3 (D.N.J. June 17, 2017) (holding that hearsay had been reduced to admissible form because "Defendant has proffered that these documents are capable of being admissible as business records"); *see also Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc*., 998 F.2d 1224, 1246, n.19 (3d Cir. 1993) (holding that hearsay could not be reduced to admissible form because proponent "does not suggest any particular [hearsay exception] under which we can conclude that the information could be admitted"). Even if Plaintiff clearly stated how she would reduce the hearsay to an admissible form at trial, no reasonable jury could infer intentional discrimination on testimony so sparse and vague, and lacking in any indication of motive. As to these claims of differential treatment, the evidence is not "significantly probative" of racial animus. *See Anderson*, 477 U.S. at 250.

In other words, as to the evidence of intentional discrimination thus far discussed, Plaintiff

has presented at most conclusory speculation of racial animus, which cannot overcome summary judgment. *See Sterner v. Siemens Medical Solutions USA, Inc.*, 706 Fed. Appx. 772, 775 (3d Cir. 2017) (affirming summary judgment in part because "Sterner fails to provide anything other than speculation to support her contention"); *Hicks v. Tech Industries*, 512 F. Supp. 2d 338, 348 (W.D. Pa. 2007) ("Speculation is simply not evidence of discrimination.") (citing *Billet v. CIGNA Corp.*, 940 F.2d 812, 816 (3d Cir. 1991) ("Merely reciting that [discrimination] was the reason for the decision does not make it so."), *overruled in part on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)). Plaintiff has failed to point to any "particular parts of materials in the record" to support these claims, and has instead restated the bare allegations in her Complaint. *See* Fed. R. Civ. P. 56(c).

Plaintiff does offer one fact to support her claim that she was not promoted because of her race. She states—and Defendant does not seem to dispute—that she had more experience than Guarini, yet he was promoted ahead of her (and is white). With more evidence that Plaintiff's race was a but-for cause of Defendant's decision to promote Guarini, this theory might have satisfied the intentional discrimination element of Plaintiff's hostile work environment claim. For example, in *Aman*, the Third Circuit declined to grant summary judgment on a hostile work environment claim because of substantial evidence that white employees were treated obviously better than black employees over a number of years, much of which the employer admitted. *See Aman*, 85 F.3d at 1082–84. However, the sole allegation that Plaintiff had marginally more experience than Guarini does not, by itself, make out a "colorable" case that Guarini was promoted because he is white, and Plaintiff was not because she is black. At most it is a "scintilla" of supporting evidence. *See Anderson*, 477 U.S. at 252. In fact, the gist of Plaintiff's theory, here, is that Guarini was promoted *because he received credit for her work*, not because of his race. To establish a link

18

between that theory and intentional discrimination, Plaintiff would need to present evidence that Guarini was assigned to review her files in the first place on the basis of race. Not only does Plaintiff fail to show that, but she plainly does not believe it to be true: she testified that Ikeme, who is also black, did not tell Guarini to oversee her work out of racial animus. Even so, various factors go into employment decisions, which this Court will not second-guess on such a sparse evidentiary record. *See, e.g.*, *Billet*, 940 F.2d at 825 ("Barring discrimination, a company has the right to make business judgments on employee status, particularly when the decision involves subjective factors deemed essential to certain positions."), *overruled in part on other grounds by St. Mary's Honor Ctr.*, 509 U.S. 502; *Reznik v. Lockheed Martin Corp.*, No. 11-5090, 2014 WL 2002267, at *2 (D.N.J. May 15, 2014) ("Anti-discrimination laws do not permit courts to make personnel decisions for employers. They simply require an employer's personnel decision be based on criteria other than those proscribed by law."). As to Plaintiff's claim that she was not promoted because of her race, the evidence only permits the inference that Defendant does not make such employment decisions based *exclusively* on seniority or experience, which is neutral, not discriminatory.

Plaintiff's remaining claims, aside from the text message, fail for another reason: white colleagues experienced identical treatment. For instance, all compliance officers were paired together under Marshall's tandem system; a white manager and secretary apparently complained about Cohen's lack of people skills and immature behavior; Cohen second-guessed everyone's work; "everybody" complained about not getting enough assignments when Cohen took over, including both officers who were promoted ahead of Plaintiff; and at least one other white officer did not receive complex files.

Plaintiff's intentional discrimination theory is further undermined by her deposition, where

19

she fails to explain virtually any instance of differential treatment in terms of her race. Plaintiff argues that the Court should ignore this testimony, because it requires an assessment of her credibility, which is the province of the factfinder. *See* Pl.'s Opp. Br., at 18–19. Plaintiff is plainly incorrect. Rule 56(c) not only permits but *requires* the party moving for summary judgment to "cit[e] to particular parts of materials in the record, including depositions" to support its assertion that a fact cannot be genuinely disputed, or to "show[] that the materials cited [by the nonmoving party] do not establish . . . the presence of a genuine dispute." *See* Fed. R. Civ. P. 56(c)(1); *see also Celotex*, 477 U.S. at 323. In pointing out how Plaintiff interprets the intent of her supervisors, Defendant is following the command of that Rule. Defendant simply argues that, if there *were* evidence that would tend to suggest intentional discrimination, then Plaintiff likely would *not* believe that her supervisors' conduct had nothing to do with her race.

In her deposition testimony, Plaintiff frequently acknowledged or implied that the conduct of her supervisors was not race-based. In many of these admissions, Plaintiff offers an alternate theory for the very conduct she alleges is discriminatory. Indeed, Plaintiff testified that Marshall implemented the tandem system because "she didn't have as much control over [officers] . . . as she thought she would because they were not following [directions]." *See* Def.'s SUMF, Ex. C, at 30:12–15. Plaintiff acknowledged that Ikeme and Cohen did not assign her as many files to review because they were still learning the system, or perhaps because she processed files more slowly than other officers in an effort to be "very thorough." *See* Def.'s SUMF, Ex. A, at 55:11. All of her supervisors, including Marshall, did not review her files because the files did not properly transfer to the master system, or because "they were bombarded with too many things or they were trying to figure out . . . the policy." *See id.* at 65:7–9. Cohen treated her unprofessionally because she was "a millennial," or because supervisors are simply supposed "to do things

20

differently." *Id.* at 82:20–21. She was denied a transfer because of Defendant's clear one-year transfer policy. And, to the extent that Cohen *did* markup Plaintiff's files more than other officers' files, she did so because Plaintiff would occasionally "use . . . a French word that's not in . . . our English vernacular." *See* Def.'s SUMF, Ex. C, at 93:20–23, 92:8–19. There is nothing preventing the Court from considering these aspects of Plaintiff's deposition testimony in determining whether to grant summary judgment. *See, e.g.*, *Sykes v. Pennsylvania State Police*, No. Civ.A.05-1349, 2007 WL 141064, at *5–6 (W.D. Pa. Jan. 17, 2007) (emphasizing similar aspects of plaintiff's deposition testimony, and granting summary judgment), *aff'd*, 2011 Fed. Appx. 526 (3d Cir. 2008). In her opposition brief, Plaintiff goes so far as to observe that "there can always be alternative reasons why each of these incidents happened." *See* Opp. Br., at 13. Although Plaintiff tells a story in which dark motives lurk behind every facially-neutral action, and although the Court's discrimination analysis focuses on the totality of the circumstances, Plaintiff's position is "blatantly contradicted" by the record, and any reasonable jury would find as such. *See Scott*, 550 U.S. at 380; *see also* Ex. C, 13:22–24 ("To be honest, I don't see the world through that prism that everything that happens, somebody's trying to get me.").

That leaves the racist text message, which Plaintiff apparently received around the summer of 2014, when Cohen was her only supervisor. For the purposes of summary judgment, Defendant does not dispute that Plaintiff received the text. *See* Def.'s Reply Br., at 9, 12.[4] Defendant only disputes whether there is any evidence in the record suggesting that the text came from Cohen or anyone else at NJEDA. *See* Def.'s Reply Br., at 9. Plaintiff, however, focuses her argument on

---

[4]      Indeed, if Defendant did dispute whether Plaintiff received the text, that would create a genuine issue of material fact that the Court would resolve in Plaintiff's favor. *See Zenith*, 475 U.S. at 587.

whether Defendant was forthcoming regarding its investigation into the text message. Plaintiff claims that while Defendant conducted a "full forensic analysis on the phone" to determine whether the racist text exists, it failed to provide that analysis to her during the discovery period,[5] and failed to make the phone itself available to Plaintiff until after discovery ended.[6] *See* Pl.'s Opp. Br., at 11–12. Plaintiff asks the Court to strike the forensic analysis from the record on that basis, to prevent Defendant from arguing that Plaintiff never received the text. *See id.* at 15–16. The Court need not address this aspect of Plaintiff's argument because Defendant does not, in fact, rely on that evidence in support of its Motion.

Setting aside these issues, the Court is left only with Plaintiff's testimony regarding the text message. There can be no doubt that a text containing the N-word conveys inherent racial animus. *See, e.g.*, *Andrews*, 895 F.2d at 1482 n.3 ("The intent to discriminate on the basis of sex in cases involving . . . sexually derogatory language is implicit, and thus should be recognized as a matter of course."); *Potter*, 435 F.3d at 450. The way in which the N-word was used in this particular text—"now you are *my* [N*****]"— reflects its most egregious history. However, what is lacking here is any evidence connecting the text to Plaintiff's supervisors. The only evidence presented in support of Plaintiff's theory that Cohen sent the text is her own equivocal deposition

---

[5]     It appears that Plaintiff made a request to examine the phone at the deposition of Cardello, which was conducted on the last day of discovery in this matter, October 8, 2019. *See* Onyejekwe Decl., Ex. C, at 1; *see also* Def.'s Resp. to Pl.'s Supp. Statement of Undisputed Material Facts, ¶ 10. At Cardello's deposition, Defendant provided documents related to Defendant's forensic analysis of the phone and, at that time, Plaintiff requested that the phone be made available to her. Onyejekwe Decl., Ex. C., at 127:21–128:11.

[6]     Attached to Defendant's reply are emails between counsel regarding Plaintiff's request to examine the phone. Defense counsel requested that Plaintiff's counsel provide a time that she could retrieve the phone, and Plaintiff's counsel said she would follow up when she was back in New Jersey. *See* Frey Cert., Ex. A. According to defense counsel, Plaintiff ultimately decided against performing a forensic analysis on the cell phone "because of the expense." Def.'s Response to Pl.'s Supplemental Statement of Undisputed Material Facts, ¶ 11.

testimony. Plaintiff testified that, because of the phrasing of the message, she presumed that someone "who had power or authority over [her]" sent it. *See* Def.'s SUMF, Ex. A, at 86:2–3. Still, Plaintiff testified that it was purely "a matter of opinion" that Cohen in particular was the sender. *Id.* at 103:18–20. Because the only evidence in the record suggesting that Cohen sent Plaintiff this text is Plaintiff's speculation, the Court finds that it is insufficient to raise a dispute of material fact. Critically, "[s]ummary judgment cannot be avoided by resorting to speculation, or statements of personal opinion or mere belief; indeed 'inference based on speculation or conjecture does not create a material factual dispute.'" *Martin v. Unknown U.S. Marshals*, 965 F. Supp. 2d 502, 527 (D.N.J. 2013) (quoting *Roberston v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990)); *see also Cappuccio v. Prime Capital Funding LLC*, 649 F.3d 180, 189 (3d Cir. 2011) ("A single, *non-conclusory* affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment. . . .") (emphasis added); *Thomas v. Delaware State Univ.*, 626 F. App'x 384, 389 n.6 (3d Cir. 2015) ("[Plaintiff's] unsupported deposition testimony, which is contradicted by the record, is insufficient to defeat summary judgment.").

If there were any evidence on which a reasonable jury could find that Cohen sent the text, it would be highly probative of the intent behind her other workplace conduct, and could provide a basis for concluding that the way in which she treated Plaintiff was motivated by racial hostility. In other words, the text could be "a window into [Cohen's] thinking" generally, *see Potter*, 435 F.3d at 450, and a "reasonable jury could interpret [her otherwise neutral] behavior [in the office] . . . as part of a complex tapestry of discrimination." *See Aman*, 269 F.3d at 1083; *Andrews*, 895 F.2d at 1484 ("What may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several other incidents."). But,

23

Plaintiff has not presented any such evidence. There is nothing in the record that even hints at the identity of the sender; Plaintiff has not produced the text, which is apparently not available anymore; and there is no circumstantial evidence connecting it to anyone at NJEDA, besides the "scintilla" of evidence that it was sent to Plaintiff's work phone. As referenced above, the only evidence supporting Plaintiff's theory that Cohen sent her the text is her speculation, which cannot itself create a genuine dispute of material fact.[7] *See Martin*, 965 F. Supp. 2d at 527. Absent any evidence in the record as to the text's origins, it cannot form the basis of a hostile work environment claim.

Plaintiff nevertheless argues that, despite any deficiencies in her evidence, a hostile work environment claim is uniquely unfit for summary judgment, because it requires the Court to evaluate subjective motivations and feelings, which are best left for the factfinder. *See* Opp. Br., at 9–10. Plaintiff cites to *White Motor Co. v. United States*, 372 U.S. 253 (1963), *Ashman v. Barrows*, 438 F.3d 781 (7th Cir. 2006), and *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93 (7th Cir. 1985), to support this theory. But each of these cases is distinguishable from the present case. *White*'s observations about summary judgment are closely connected to the antitrust context, and more specifically, to per-se violations of the Sherman Act, such as price fixing. *See White*, 372 U.S. at 259–60. In *Ashman*, the Seventh Circuit was admittedly "leery of resolving issues involving a state of mind on summary judgment," but largely because "the record [was] replete with incidents which [were] open to interpretation," which is not the case here. *See Ashman*, 438 F.3d at 784. *Stumph*, too, is factually distinct. Summary judgment was "improper," there, because the factfinder had to weigh "conflicting indications of motive and intent" on a material issue about age

---

[7]      Curiously, it does not appear that Plaintiff deposed Cohen as part of this litigation despite the significant role she plays in Plaintiff's hostile work environment claim.

discrimination—for instance, a statement by the defendant that it wanted to get rid of older employees. *See Stumph*, 770 F.2d at 97. In the present case, Plaintiff has not put forth any evidence of conflicting motive or intent, nor evidence that is as probative of her supervisors' mental states. What is more, the totality of the circumstances analysis is how courts in this circuit have decided to deal with the challenge of inferring intent or motive from facially-neutral conduct, rather than imposing a bright-line rule that such cases are not fit for summary judgment. *See, e.g.*, *Durham Life*, 166 F.3d at 149 ("Particularly in the discrimination area, it is often difficult to determine the motivations of an action and any analysis is filled with pitfalls and ambiguities . . . [so] a discrimination analysis must concentrate not on individual incidents, but on the overall scenario."); *Andrews*, 895 F.2d at 1484–85.

Finally, in determining whether Plaintiff has met the intentional discrimination element of her hostile work environment claim, the Court must be guided by the ordinary meaning of "because of," which is "'by reason of' or 'on account of.'" *University of Tex. Southwestern Medical Center v. Nassar*, 570 U.S. 338, 350 (2013) (citing *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176 (2009)). In Title VII cases such as this one, that term incorporates the "simple" but "traditional" but-for causation test, *id.* at 346, 360, which means that Defendant cannot defeat liability merely by pointing to *other* factors that *also* contributed to the differential treatment that Plaintiff alleges, even if those factors were the primary or main ones. *Id.* at 350. This can be an expansive, sweeping test. Even so, here, a reasonable jury could not conclude by a preponderance of the evidence that Plaintiff's race was a but-for cause of her treatment, because there is no evidence that her supervisors considered her race at all in their management decisions. Indeed, the record tends to show that Plaintiff's race was not a contributing factor to any differential treatment she faced.

In sum, the Court finds that Plaintiff's evidence is insufficient to support her claim of intentional discrimination, even if there were friction with her supervisors or Cohen treated her "rudely." *See Barber v. University of Medicine and Dentistry of New Jersey*, 118 Fed. Appx. 588, 591 (3d Cir. 2004). The record wholly lacks evidence on which a reasonable jury could infer racial animus or establish a nexus between Plaintiff's workplace environment and her race. *See Sykes*, 2011 Fed. Appx. at 529. Opposing summary judgment here, Plaintiff offers only "bare assertions, conclusory allegations [and] suspicions" to support her claims of differential treatment, none of which is sufficient to create a genuine factual dispute. *See Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Simply put, federal law "does not guarantee a utopian workplace, or even a pleasant one." *Waite v. Blaire*, 937 F. Supp. 460, 468 (W.D. Pa. 1995) (quoting *Vore v. Indiana Bell Tel. Co., Inc.*, 32 F.3d 1161, 1162 (7th Cir. 1994)). "Employees are not insulted from personality conflicts, favoritism, nepotism, or, for that matter, from most inequities encountered in the workplace." *Sykes*, 2007 WL141064, at *5. And, Plaintiff herself admitted, "there's favoritism everywhere." *See* Ex. A, 145:8.

Because Plaintiff has failed to make out a prima facie case of intentional discrimination, the Court does not need to address the remaining elements of her hostile work environment claim, nor Defendant's defense that there is no basis for respondeat superior liability under *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). *See Celotex*, 477 U.S. at 323 ("[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial . . . . because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."). Accordingly, summary judgment is granted on Plaintiff's hostile work environment claim.

*B. Race Discrimination Claim*

Plaintiff also asserts that she was fired because of her race, in violation Title VII. To defeat a summary judgment motion on a race discrimination claim, a plaintiff must present evidence showing a genuine dispute of material fact on four elements: "(1) that [s]he is a member of a protected class; (2) that [s]he is qualified for the position; (3) that [s]he was either not hired or fired from that position; (4) under circumstances that give rise to an inference of unlawful discrimination such as might occur when the position is filled by a person not of the protected class." *Jones v. City of Philadelphia*, 198 F.3d 403, 410–11 (3d Cir. 1999); *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir. 1995). For the purposes of summary judgment, Defendant concedes the first three elements, but argues that Plaintiff has not presented any evidence on which a reasonable jury could find that she was terminated "under circumstances giving rise to the inference of discrimination." *See* Brief for Defendant, at 43.

A plaintiff may raise an inference of unlawful discrimination by showing "some causal nexus between [her] membership in a protected class" and her termination. *See Sarullo v. United States Postal Service*, 352 F.3d 789, 798 (3d Cir. 2003). A plaintiff may establish a causal nexus by presenting evidence that her employer treated a similarly-situated, non-minority employee differently. *See, e.g.*, *Cange v. Philadelphia Parking Auth.*, No. 08-3480, 2009 WL3540784, at *6 (E.D. Pa. Oct. 30, 2009); *Ade v. KidsPeace Corp.*, 698 F. Supp. 2d 501, 512 (E.D. Pa. 2010).

In the present case, there is no nexus between Plaintiff's race and her termination, and no evidence that similarly-situated, non-minority employees were treated differently. In fact, Ciallella terminated a white employee on the same day he terminated Plaintiff. *See* Def.'s SUMF, Ex. J. The racist text Plaintiff received might, in the abstract, establish a nexus, but it suffers from the same proof problems as discussed above. It is also remote in time from when Plaintiff was terminated (six months or more removed); Plaintiff does not allege that Ciallella, who terminated

27

her, knew about the text, much less sent it; and Plaintiff presents no evidence that Cohen, if indeed she is the sender, played any role in the decision-making process leading to her termination. *See, e.g.*, *Pivrotto v. Innovative Sys. Inc.*, 191 F.3d 344, 359 (3d Cir. 1999) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."). Accordingly, the text cannot serve as a basis for inferring that racial animus caused Ciallella to terminate Plaintiff, even if the Court assumes that Cohen sent it. *See, e.g.*, *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1112 (3d Cir. 1997) (holding that a statement made by a decisionmaker four to five months prior to termination was an insufficient basis from which to infer discrimination, because it was not directly related to termination).

Critically, even if Plaintiff could prove that the circumstances of her termination raise an inference of unlawful discrimination, she has failed to submit any evidence that Defendant's reasons for terminating her were pretextual. *See Burdine*, 450 U.S. at 253; *McDonnell Douglas*, 411 U.S. at 804. To establish that a defendant's stated reasons for termination were pretextual, a plaintiff can advance two theories: she can "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating reason or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764; *see also Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 (3d Cir. 2006).

Under the second theory, a plaintiff may defeat summary judgment by "show[ing] that the employer has previously discriminated against her, that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class."

*See, e.g.*, *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998). In the present case, the only evidence Plaintiff could remotely point to for proof that racial animus caused her termination is the racist text, which is not sufficient for the reasons already discussed. Thus, theory two is foreclosed.

A plaintiff seeking to defeat summary judgment under the first theory—that a factfinder could reasonably disbelieve Defendant's stated reasons—cannot simply offer evidence that the employer's decision "was wrong or mistaken," *see Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005), but must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons . . . that a reasonable factfinder could rationally find them 'unworthy of credence,'" *see Fuentes*, 32 F.3d at 765; *Jones*, 198 F.3d at 413 ("[T]he employer's articulated reason [must not be] merely wrong, but . . . so plainly wrong that it cannot have been the employer's real reason."); *see also Coulton v. Univ. of Pennsylvania*, 237 Fed. Appx. 741, 747 (3d Cir. 2007). In determining whether grounds exist to disbelieve an employer's stated reasons, courts must be careful not to "act as a super-personnel department over an employer's business judgment." *See Clearly v. CBRL Group*, No. 3:05CV02246, 2007 WL2212846, at *7 (M.D. Pa. July 31, 2007).

In the present case, Plaintiff has not presented sufficient evidence from which a factfinder could reasonably disbelieve Defendant's stated reasons for terminating Plaintiff. From the beginning, Plaintiff knew she was an at-will employee. Plaintiff also recognized the inherently temporary nature of her job, because applications for relief would eventually dwindle, funding would eventually dry up, and the aid program would eventually end. In fact, Plaintiff sought a transfer in the fall of 2014 precisely because work was slowing down. Plaintiff argues that the Court should nevertheless find a contradiction in the reasons Defendant offers. The Court declines

to do so. It is perfectly reasonable that, when a finite, government-funded program is ending, an employer will first discharge at-will employees whose jobs are tied to the program. Plaintiff fails to recognize that "[t]he question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discriminatory." *See Atkinson*, 460 F.3d at 454; *see also Kautz*, 412 F.3d at 467 ("Pretext is not shown by evidence that . . . the employer is [not] wise, shrewd, prudent, or competent.") (citing *Fuentes*, 32 F.3d at 765)). And the record on that score is simply empty. Plaintiff offers unsupported speculation that Ciallella took her race into consideration when terminating her, and nothing more, which is not sufficient to defeat summary judgment. *See Coulton*, 237 Fed. Appx. at 749. Accordingly, summary judgment on this claim is granted.

## IV. CONCLUSION

Plaintiff has failed to offer evidence from which a reasonable jury could infer that her work environment was intentionally discriminatory. Plaintiff also has failed to offer evidence from which a reasonable jury could conclude that she was terminated because of her race. Accordingly, Defendant's Motion for Summary Judgment is **GRANTED**.


**DATED**:  June 22, 2020                                    /s/ Freda L. Wolfson
                                                          Freda L. Wolfson
                                                          U.S. Chief District Judge